**William CAMERON and Alaska Airlines, Inc., Appellants,**

v.

**Deborah CHANG–CRAFT, Appellee.**

No. S–13489.

Supreme Court of Alaska.

April 15, 2011.

---

Douglas S. Parker, Littler Mendelson, P.C., Portland, Oregon, Jennifer M. Coughlin, K & L Gates, Anchorage, for Appellants.

Kenneth W. Legacki, Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE and WINFREE, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

An employee filed suit against her employer for wrongful termination after her union refused to take her grievance to arbitration under the applicable collective bargaining agreement. Relevant federal law required the employee to prove as part of her wrongful termination claim that her union had breached its duty of fair representation when handling her grievance.[1] During trial the employer twice moved for a directed verdict, arguing the employee failed to prove the union had breached its duty of fair representation. The trial court denied the motions. The jury returned a special verdict finding that the union had breached its duty of fair representation and that the employer had wrongfully terminated the employee, and awarded $479,111 as compensation for the wrongful termination. The employer moved for judgment notwithstanding the verdict (JNOV), again arguing the employee failed to prove the union had breached its duty of fair representation. The employer alternatively moved for a new trial or remittitur, arguing the damage award was inaccurate. The trial court denied the motions.

The employer appeals the trial court's denials of its motions for a directed verdict, JNOV, and a new trial or remittitur. Because the trial court did not commit legal error or abuse its discretion in denying the motions, we affirm the trial court's decisions

---

1. *See Vaca v. Sipes,* 386 U.S. 171, 186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

and the entry of judgment against the employer.

## II. FACTS AND PROCEEDINGS

Deborah Chang–Craft worked as a customer service agent for Alaska Airlines, Inc. under a collective bargaining agreement (CBA) between Alaska Airlines and the International Association of Machinists and Aerospace Workers (Union). Chang–Craft's wrongful termination claim against Alaska Airlines centers on events occurring December 14–15, 2003, at the Alaska Airlines cargo facility where she worked.

Chang–Craft claimed that on the evening of December 14, coworker William Cameron approached her saying, "I want to show you my new baby," and proceeded to use her computer to show her a picture of a gun. Chang–Craft claimed she previously told Cameron several times she was not interested in guns, and this time she told him to leave her alone and not to bring guns to work. Chang–Craft claimed Cameron approached her again shortly thereafter and told her she displayed "the classic signs" of Obsessive–Compulsive Disorder (OCD).

Cameron claimed that after telling Chang–Craft about his new gun, she told him: "It's a good thing that I don't have [a gun]. If I did, I would probably use it." Cameron claimed he later observed Chang–Craft appearing "agitated and upset" and out of concern for her health asked if she had been diagnosed with OCD. Cameron claimed that in response Chang–Craft went on a diatribe about her job and coworkers.

The next day, December 15, Cameron met with Miranda Bowey, an Alaska Airlines employee services manager, detailing his version of the previous day's events. Union shop steward[2] Cheryl Eniero was in attendance at Bowey's request, and Eniero listened to Cameron's initial description of the events. When Eniero asked Cameron why he continued to follow Chang–Craft after she had asked him to leave her alone, Cameron asked Eniero to leave the meeting; she did. After the meeting Bowey advised Eniero that she was going to call Chang–Craft to talk to management later that day. Eniero went to Chang–Craft to let her know about the meeting, that the meeting was about Cameron, and that Eniero would be available as her Union representative at the meeting. It is unclear whether Eniero told Chang–Craft about the statements she heard Cameron give Bowey, but her testimony at trial indicates she did not. At some point Eniero learned that Bowey intended to suspend Chang–Craft's employment, but did not tell Chang–Craft.

According to Chang–Craft, that evening supervisor Mike Stanley told her "we need to see you upstairs" but assured her that a shop steward would be present at the meeting. But when Chang–Craft went upstairs, Bowey "call[ed] out to [Chang–Craft]" and, without a shop steward present, told Chang–Craft she was suspended, she must hand over her badge, Bowey and Stanley would escort her from the building, and if she did not leave quietly they would call the police. Chang–Craft felt "frantic" and "frightened" after Bowey told her she was suspended. Eniero was working in a copy room and was unaware that Bowey and Stanley actually called Chang–Craft to the meeting until Chang–Craft, upset and crying, came into the room to tell Eniero that Chang–Craft was being sent home. Eniero gave Chang–Craft a "brief synopsis" of Cameron's statements to Bowey and told Chang–Craft to "just go ahead and go home and we'll deal with ... it," and Chang–Craft left the room. Eniero did not see Chang–Craft again that day.

Bowey and Stanley followed Chang–Craft as she collected her things. Bowey insisted on taking Chang–Craft's badge, and Bowey yelled that she was going to call the police. Chang–Craft retrieved her personal belongings from her locker and exited the building. Bowey came out after Chang–Craft, telling her to come back into the building; a police officer was already standing by Chang–Craft's car and more police cars were coming.

In his deposition presented at trial, Stanley testified that after Chang–Craft collected

---

2. A shop steward is "[a] union official who represents union employees and who oversees the performance of union contracts." BLACK'S LAW DICTIONARY 1549 (9th ed.2009).

her belongings and was leaving the building she said "she was never setting foot inside this 'F-ing' place again." Chang–Craft countered that her words were taken out of context, and in actuality she meant she was not going back into the building that night. Chang–Craft claimed she refused to talk with Bowey because she felt she lacked assistance from a union representative. One of Chang–Craft's coworkers called Chang–Craft's husband, who came to the parking lot. Bowey and Stanley walked away, and the police allowed Chang–Craft to drive her car out of the parking lot.

Chang–Craft claimed she was told not to return to work until further notice. But on December 22 Alaska Airlines sent Chang–Craft a letter stating that her December 15 statement that she was "never coming back," combined with emptying her personal belongings from her locker and failing to respond to telephone calls or requests to participate in the investigation, constituted a resignation, which the company accepted. After receiving the letter, Chang–Craft submitted a "Grievance, Suspension, and Discharge Appeal" to the Union, alleging that Alaska Airlines failed to conduct an impartial investigation of the incident and wrongfully terminated her.

In January 2004 three Union shop stewards represented Chang–Craft at a step-one grievance hearing with Alaska Airlines.[3] Chang–Craft did not attend the meeting because the chief shop steward advised her not to attend. At the hearing the shop stewards argued that Chang–Craft's December 15 statement was not intended as a resignation and was taken out of context. Alaska Airlines denied the grievance.

Jerri Lochner, the Union shop steward who originally filed Chang–Craft's grievance, testified that she disagreed with the Union's decision not to have Chang–Craft attend the step-one hearing. Lochner testified that in her opinion "grievant[s] should always be [at the step-one hearing] to present their side" and because Chang–Craft was not, she was not represented fairly. But Lochner also testified that in her opinion Alaska Airlines had not investigated the incident and its representatives "came in there not really wanting to resolve this" but only "to hear what we had to say." Lochner testified on cross-examination that neither Alaska Airlines nor the Union cooperated as required by the CBA.

Lochner helped compile and send the grievance documentation to the Union's General Chair, Don Welch, for a step-two grievance hearing.[4] At the beginning of February 2004 Welch sent a letter to Alaska Airlines requesting "further handling" of Chang–Craft's grievance in accordance with the CBA. Alaska Airlines responded by holding a step-two hearing, but at the end of March 2004 again denied the grievance.

Robert Hartnett, the Alaska Airlines labor services manager who denied Chang–Craft's grievance after the step-two hearing, testified during Alaska Airlines's case that although he was involved from the beginning, he began handling Chang–Craft's grievance on behalf of Alaska Airlines for the second step of the process. Hartnett explained that during a step-two hearing Alaska Airlines becomes aware of all the details surrounding a grievance as the Union and the employer debate whether the grievance should be granted. Hartnett testified that Welch was a "worthy opponent" and that he and Welch talked about Chang–Craft's grievance "on a number of occasions." Hartnett testified that Welch vigorously argued the case for Chang–Craft at the step-two hearing. But on cross-examination Hartnett conceded that no documents in his grievance-hearing file supported Alaska Airlines's position that Chang–Craft had resigned, and further conceded that the Union had not provided him

---

**3.** Under the CBA grievance resolution procedure, a discharged employee may request a hearing. At the step-one hearing, the employee may be represented by the shop steward and/or the Union General Chair or a designee. The employee or the representative may present oral and written evidence. The employer must render its decision within seven days of the hearing.

**4.** Under the CBA, if a grievance is not satisfactorily settled at step one the Union's General Chair may appeal to the employer and a second hearing will be held.

with any documentation to the contrary. Hartnett testified that "background" information was not "pertinent" to his decision whether she resigned or was terminated, that he had not been aware of the specifics of the incident between Chang–Craft and Cameron, that the Union did not give him any documents to review, and that he had no notes of what actually occurred at the step-two hearing.

In early April 2004 Welch appealed to the System Board of Adjustment for an arbitration "hearing and decision" regarding Chang–Craft's grievance.[5] But in late August 2004 Welch wrote to Chang–Craft informing her that "[a]fter reviewing the facts of your grievance, the contract language and any prior arbitration awards which would be applicable to your case" the Union had "tentatively decided to withdraw" her grievance from the System Board of Adjustment. Welch noted that Chang–Craft could appeal the Union's tentative decision by submitting a written statement detailing the merits of her grievance and reasons why the Union should pursue it or why Chang–Craft should be permitted to pursue it on her own.

Chang–Craft testified that she had no meaningful communication from the Union during the eight months between the step-one hearing and Welch's letter explaining the Union's tentative decision. Chang–Craft claimed she telephoned the Union's Minnesota and Seattle offices several times to "get an update" on her grievance, but the Union consistently told her "[she] just needed to be patient." When asked about her experience with Welch, shop steward Lochner responded that "[i]t was very difficult to deal with him, in general." She testified that Welch often lost paperwork, he "was not very good with his follow-through," and timelines "were extended a lot with him." Lochner testified that she nicknamed Welch's office "Grievance Land" because when she filed a grievance with Welch she "never knew what happened . . . or where it was."

Chang–Craft retained an attorney to respond to the Union's tentative decision to withdraw her grievance from arbitration, and in mid-September 2004 her attorney sent a letter to the Union asking it to "reconsider the decision to withdraw [her] grievance" based on the following points: (1) Chang–Craft had never been "written up or disciplined" during her six years of employment and she had never owned or fired a gun; (2) Chang–Craft denied making any violent threat and insisted the evidence would demonstrate that Cameron's allegations were "inconsistent with [her] personality, history and temperament"; (3) Chang–Craft requested the presence of a union representative at the investigatory meeting but was denied the right to union representation; (4) Chang–Craft's statement about not returning to the building was misconstrued by her employer as a resignation; and (5) Chang–Craft claimed she had been subjected to Cameron's inappropriate behavior before, postulating that Cameron's allegations were retaliatory because he knew she wanted to file a grievance against him. The Union responded that it would reopen the matter.

Fifteen months later, in mid-December 2005, the Union's new General Chair informed both Alaska Airlines and Chang–Craft that the Union would not proceed with Chang–Craft's grievance before the System Board of Adjustment.[6] The Union never responded to the substance of Chang–Craft's attorney's letter and never provided Chang–Craft an explanation for its refusal to proceed with her grievance.

At the beginning of December 2005 Chang–Craft filed a defamation claim against Cameron, alleging his statement "that she was going to shoot her fellow employees" caused her to be wrongfully terminated from Alaska Airlines. Chang–Craft amended her complaint to include a wrongful termination and separate defamation claim against Alaska Airlines after the Union withdrew her grievance from arbitration. The case went to trial in October 2008.

---

**5.** Under the CBA, if the step-two hearing does not satisfactorily resolve the grievance, the Union's General Chair may seek arbitration.

**6.** In 2004 Welch lost an election to continue as General Chair and a new General Chair took over sometime in 2005. Welch died before trial.

Jacquelyn Briskey, a certified public accountant testifying as an expert witness, estimated Chang–Craft was entitled to approximately $518,000 in past and future damages. She determined Chang–Craft would have worked approximately 5 more years and, based on her life expectancy, Chang–Craft's retirement would last approximately 27 years. Lost travel benefits were a large portion of Chang–Craft's damages; based on her travel history and future travel plans, Briskey calculated Chang–Craft's future travel benefits to include approximately 25 round-trip flights per year. Briskey valued each flight at $625, which represented the cost of buying enough Alaska Airlines frequent flier miles for a round-trip airplane ticket. Briskey also testified that her damages estimate did not separate out Chang–Craft's personal travel benefits from her family's and that Chang–Craft would have received transferable travel vouchers while retired.

Towards the end of Briskey's testimony, Alaska Airlines moved to strike a portion of her testimony as contrary to a pretrial ruling that Chang–Craft could not recover damages for lost travel benefits for non-dependent family members. Chang–Craft argued that the pretrial order precluded recovery only for third-party travel benefits, but not travel benefits that would have been given directly to her for transfer to family members, such as "buddy passes." When Alaska Airlines argued that Briskey's damages calculations did not make such a distinction, the trial court concluded that the dispute was a question of fact for the jury and that it would give an appropriate jury instruction. The court denied the motion to strike the portion of Briskey's testimony.

At the close of Chang–Craft's case-in-chief and again at the close of all of the evidence, Alaska Airlines moved for a directed verdict on Chang–Craft's wrongful termination claim, arguing Chang–Craft failed to establish the Union had breached its duty of fair representation. The trial court denied the first motion because reasonable inferences

from Chang–Craft's testimony about the Union's lack of response to (1) her inquiries regarding her grievance and (2) her attorney's letter appealing the Union's tentative decision to withdraw her grievance provided "enough evidence to raise an issue of material fact" even though there was "not a lot of evidence" demonstrating the Union had breached its duty of fair representation. The trial court denied the second motion "[f]or the reasons already stated."

The jury returned a special verdict, finding in relevant part that: (1) Alaska Airlines wrongfully terminated Chang–Craft; (2) the Union violated its duty of fair representation; and (3) Chang–Craft was entitled to compensation totaling $479,111 for the wrongful termination.[7] Alaska Airlines moved for JNOV, claiming Chang–Craft failed to prove the Union had breached its duty of fair representation. Alaska Airlines alternatively moved for a new trial or remittitur, claiming Chang–Craft failed to establish an accurate estimate of her lost travel benefits because Briskey improperly included travel benefits for Chang–Craft's family and friends.

The trial court denied both motions. Addressing the JNOV motion, the trial court found "sufficient evidence to support the jury's verdict." The trial court first noted evidence indicating the Union "failed to adequately pursue the grievance after [step one] of the procedure," citing the lack of evidence demonstrating the Union had actually considered Chang–Craft's appeal during the one-year delay between the Union's tentative decision and its final decision to withdraw her grievance from arbitration. The trial court found that a reasonable jury could infer from both the delay and the Union's lack of response to Chang–Craft's attorney's letter that the Union failed to consider her grievance properly. The trial court also concluded the jury could have reasonably found the Union failed to "exercise special care" when handling Chang–Craft's grievance for wrongful termination, "the most extreme sanction an employer can impose against an employee."

7. The jury also found that Cameron and Alaska Airlines separately defamed Chang–Craft and awarded her $5,000 on each claim.

Addressing the motion for a new trial or remittitur, the court found the jury's damage award rational given the evidence presented. The court observed that Chang–Craft's expert witness determined the value of future lost travel benefits by multiplying the number of flights per year by "the monetary value of airline miles." The court also noted that Jury Instruction 27 "was very clear" that Chang–Craft could not recover for her family's travel benefits, but that she could seek compensation for transferable travel benefits "she herself would have received through employment and retirement."[8] The court therefore denied the motion for a new trial or remittitur.

Alaska Airlines appeals the trial court's decisions denying the motions for directed verdict, JNOV, and a new trial or remittitur.[9]

## III. DISCUSSION

### A. Motions For Directed Verdict And JNOV

#### 1. Legal standards for the motions; standard of review for the rulings

Motions for directed verdict and JNOV are provided for in Alaska Rule of Civil Procedure 50. Rule 50(a) acknowledges that a motion for directed verdict may be made after the close of the opponent's evidence and provides that in the event the motion is denied, the moving party may then present its evidence.[10] Rule 50(b) recognizes that a motion for directed verdict may be made at the close of all the evidence but before the case is submitted to the jury, and provides that in the event the motion is denied or otherwise not granted, the case is submitted to the jury subject to a later determination of the legal questions raised in the motion.[11] Rule 50(b) further provides that a party who unsuccessfully moved for directed verdict may move to set aside an adverse verdict and judgment and have judgment entered in its favor in accordance with its motion for directed verdict,[12] which is referred to as a motion for judgment notwithstanding the verdict.[13]

At the close of Chang–Craft's evidence Alaska Airlines moved for directed verdict on her wrongful termination claim, arguing that Chang–Craft had not presented sufficient evidence to establish that the Union had breached its duty of fair representation. That motion was denied, and Alaska Airlines

---

**8.** The relevant jury instruction, entitled "Travel Benefits," prohibited Chang–Craft from "enforc[ing] the rights of her parents and children to their own travel benefits," but allowed her to "seek compensation for travel benefits that she herself would have received . . . and could transfer to others." Alaska Airlines did not object to this instruction.

**9.** Both Alaska Airlines and Cameron filed this appeal, with a number of the stated points on appeal relating to the trial court's denial of summary judgment motions on Chang–Craft's wrongful termination and defamation claims and to evidentiary rulings at trial regarding testimony about Cameron's harassment of Chang–Craft and other Alaska Airlines employees. In their opening brief, Alaska Airlines and Cameron expressly waived their challenges to the jury's verdict on Chang–Craft's defamation claims. Alaska Airlines and Cameron did not brief any of the other appeal points, and they are therefore waived. *Partridge v. Partridge*, 239 P.3d 680, 687 n. 25 (Alaska 2010) ("A party's failure to brief an issue constitutes abandonment of that issue." (quoting *Booth v. State*, 903 P.2d 1079, 1090 (Alaska App. 1995))).

Chang–Craft filed a cross-appeal, raising as a sole point on appeal that the trial court erred by

permitting the jury to allocate fault between Alaska Airlines and the Union and then reducing the judgment against Alaska Airlines accordingly. Chang–Craft later dismissed her cross-appeal.

**10.** "A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted . . . as if the motion had not been made." Alaska R. Civ. P. 50(a).

**11.** "Whenever a motion for directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." Alaska R. Civ. P. 50(b).

**12.** "[A] party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for directed verdict[.]" Alaska R. Civ. P. 50(b).

**13.** *See* Alaska R. Civ. P. 50(c) (referring to Rule 50(b) motion as "motion for judgment notwithstanding the verdict").

presented its evidence. At the close of all the evidence Alaska Airlines renewed its motion for directed verdict on the same ground. The renewed motion was denied. Alaska Airlines then timely moved for JNOV on the same ground. That motion also was denied.

■■■ Alaska Airlines appeals all three rulings. This causes us to consider whether the record for review is different for the different motions. We first note that a party cannot appeal the denial of a JNOV motion if the party did not move for a directed verdict at the close of the evidence, although failure to bring a JNOV motion does not preclude review of the denial of a motion for a directed verdict made at the close of all the evidence.[14] But because both motions focus on the state of the record at the close of all the evidence, there should be no material difference in the motions, how they are decided, or how they are reviewed on appeal.[15] We next note that a mid-trial directed verdict motion

is essentially a summary judgment motion made after the close of an opponent's case.[16] We have held that the denial of a summary judgment motion due to a factual dispute may not be appealed after trial.[17] The denial of a mid-trial directed verdict due to a factual dispute likely should be treated in similar fashion, but because Alaska Airlines again moved for a directed verdict at the close of the evidence, we review the denial of the directed verdict motions, along with the denial of the JNOV motion, on the full record presented to the jury.[18]

■■■ We next consider the standard for directed verdict and JNOV motions. The substantive legal question[19] is "whether the evidence, and all reasonable inferences which may be drawn from the evidence, viewed in the light most favorable to the non-moving party, permits room for diversity of opinion among reasonable jurors."[20] Because con-

---

14. *Sherbahn v. Kerkove,* 987 P.2d 195, 198 n. 5 (Alaska 1999).

15. *See Hagen Ins., Inc. v. Roller,* 139 P.3d 1216, 1219 (Alaska 2006) (quoting *Bobich v. Stewart,* 843 P.2d 1232, 1235 (Alaska 1992)) (indicating congruence between standard for reviewing denial of JNOV and directed verdict motions).

16. *Compare Burnett v. Covell,* 191 P.3d 985, 990 (Alaska 2008) (summary judgment is not granted when "reasonable jurors could disagree on the resolution of a factual issue"), *with Murray E. Gildersleeve Logging Co. v. N. Timber Corp.,* 670 P.2d 372, 377 (Alaska 1983) (directed verdict is granted when "reasonable jurors could not differ in their resolution of a disputed issue of fact"). The United States Supreme Court has held that the two standards are the same. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))); *Bill Johnson's Rests., Inc. v. NLRB,* 461 U.S. 731, 745 n. 11, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) ("The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted."). *See generally* 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 50.06[5][b] (3d ed. 2010) ("The standard applicable to pretrial motions for summary judg-

ment under Rule 56 is identical to the standard for motions for judgment as a matter of law during or after trial under Rule 50.").

17. *Larson v. Benediktsson,* 152 P.3d 1159, 1169 (Alaska 2007) ("[P]olicy, reason, and precedent militate in favor of a rule that precludes post-trial review of orders denying motions for summary judgment—at least when the 'motions are denied on the basis that there are genuine issues of material fact.'" (quoting *Ondrusek v. Murphy,* 120 P.3d 1053, 1056 n. 2 (Alaska 2005))).

18. *See Bohna v. Hughes, Thorsness, Gantz, Powell, & Brundin,* 828 P.2d 745, 761 n. 41–42 (Alaska 1992) (considering testimony occurring after denial of mid-trial directed verdict motion when reviewing appeal of denial of motions for directed verdict and JNOV), *superseded by statute on other grounds as recognized in Petrolane Inc. v. Robles,* 154 P.3d 1014, 1019–20 (Alaska 2007).

19. *Taylor v. Interior Enters., Inc.,* 471 P.2d 405, 407 (Alaska 1970) (regarding common law motions for directed verdict, whether there is factual question to be presented to jury is question of law); 9B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2524 (3d ed.2008) (stating it "no longer is subject to doubt that whether the evidence presented at trial is sufficient to create an issue of fact for the jury or will permit the court to enter judgment as a matter of law is solely a question of law").

20. *City of Delta Junction v. Mack Trucks, Inc.,* 670 P.2d 1128, 1130 (Alaska 1983) (citing *City of Whittier v. Whittier Fuel & Marine Corp.,* 577

flicting evidence is not to be weighed and witness credibility is not to be judged on appeal,[21] generally the only evidence that should be considered is the evidence favorable to the non-moving party—if that evidence is insufficient to allow a reasonable juror to find for the non-moving party, the trial court should grant a directed verdict or JNOV motion. But such motions "should be scrutinized under a principle of minimum intrusion into the right to jury trial guaranteed under the Alaska Constitution.... If there is any doubt, questions of fact should be submitted to the jury." [22]

■ Finally, we note that because the sufficiency of the evidence to support a jury verdict is a question of law, our review is de novo.[23]

### 2. Legal standards for the Union's duty of fair representation

■ Because Chang–Craft's employment with Alaska Airlines was governed by the CBA and her wrongful termination claim is predicated on a breach of the CBA,[24] section 301 of the Labor Management Relations Act applies.[25] Federal substantive law therefore

governs Chang–Craft's wrongful termination claim.[26]

■ Under relevant federal law "an employee must attempt to exhaust exclusive grievance and arbitration procedures established by a[CBA]" and may bring a direct action against a private employer for wrongful termination if "the union wrongfully refuses to process the grievance" [27] and the employee establishes "the union ... breached its duty of fair representation in its handling of the employee's grievance." [28] This is not an easy standard to meet, and an employee faces a "formidable challenge" to establish a union's breach of its duty of fair representation.[29] A union breaches its duty of fair representation "only when [the union's] conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." [30]

The United States Supreme Court has recognized that "under the arbitrary prong, a union's actions breach the duty of fair representation only if [the union's conduct] can be fairly characterized as so far outside a wide range of reasonableness that it is wholly

---

P.2d 216, 220 (Alaska 1978) (directed verdict)); *accord Ayuluk v. Red Oaks Assisted Living, Inc.,* 201 P.3d 1183, 1196 & n. 27 (Alaska 2009) (directed verdict); *L.D.G., Inc. v. Brown,* 211 P.3d 1110, 1117–18 (Alaska 2009) (JNOV).

**21.** *City of Whittier,* 577 P.2d at 220, *disapproved on other grounds, Native Alaskan Reclamation & Pest Control, Inc. v. United Bank Alaska,* 685 P.2d 1211, 1220 (Alaska 1984); *accord Turner v. Municipality of Anchorage,* 171 P.3d 180, 185 (Alaska 2007) (citing *Wal-Mart, Inc. v. Stewart,* 990 P.2d 626, 631–32 (Alaska 1999)).

**22.** *City of Delta Junction,* 670 P.2d at 1130 n. 2 (regarding directed verdict motions); *accord Cummins, Inc. v. Nelson,* 115 P.3d 536, 544 (Alaska 2005).

**23.** *L.D.G.,* 211 P.3d at 1117 ("We review *de novo* the grant of a directed verdict and the grant of a judgment notwithstanding the verdict....").

**24.** A wrongful termination claim requires proof not only that an employee was discharged, but also that "the employer breached a contract ... in connection with the employee's termination." *Miller v. Safeway, Inc.,* 170 P.3d 655, 658 n. 11 (Alaska 2007) (quoting *Charles v. Interior Reg'l Hous. Auth.,* 55 P.3d 57, 59 (Alaska 2002)).

**25.** *See Schaub v. K & L Distribs., Inc.,* 115 P.3d 555, 560 (Alaska 2005) ("For cases involving private employers, claims that are founded directly on rights created by [CBAs] and claims 'substantially dependent upon analysis of a[CBA]' are governed by § 301 of the Labor Management Relations Act." (quoting *Caterpillar Inc. v. Williams,* 482 U.S. 386, 394, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987))); *see also* Labor Management Relations Act of 1947 § 301, 29 U.S.C. § 185(a) (2006).

**26.** *Schaub,* 115 P.3d at 560 n. 9 ("Actions arising under § 301 are controlled by federal substantive law even though brought in state court." (citing among others *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers,* 390 U.S. 557, 559–60, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968))).

**27.** *Id.* at 560–61, 88 S.Ct. 1235 (citing *Vaca,* 386 U.S. at 184–85, 87 S.Ct. 903).

**28.** *Id.* at 561, 87 S.Ct. 903 (quoting *Vaca,* 386 U.S. at 186, 87 S.Ct. 903).

**29.** *Id.* at 562, 87 S.Ct. 903.

**30.** *Id.* (quoting *Vaca,* 386 U.S. at 190, 87 S.Ct. 903).

irrational or arbitrary."[31] The Court has acknowledged that granting a "wide range of reasonableness" allows unions necessary discretionary decision-making powers, "even if those judgments are ultimately wrong."[32] The Court has further explained that "[a] union's conduct can be classified as arbitrary only when it is irrational, ... without a rational basis or explanation,"[33] and that mere negligence by a union does not breach the duty of fair representation.[34]

In *Schaub v. K & L Distributors, Inc.*, we provided further guidance for evaluating whether a union's handling of a grievance was arbitrary.[35] We cited approvingly a Ninth Circuit case, *Tenorio v. NLRB*, observing that a union must investigate grievances brought to it, and that "the sufficiency of the union's actions will vary with each case."[36] We acknowledged that although unions have a "reasonable range of discretion" in handling grievances, that discretion is not limitless; a union may not "egregious[ly] disregard" union members' rights.[37] And we adopted the Ninth Circuit's approach that in grievances concerning employee termination a union has additional responsibility "to exercise special care in handling [the] grievance because [it] concern[s] ... the most serious sanction an employer can impose."[38]

### 3. The trial court did not err by denying Alaska Airlines's motions for directed verdict and JNOV.

Alaska Airlines argues the Union did not "egregious[ly] disregard" Chang–Craft's rights, but rather met the special handling requirement for employee termination grievances. Alaska Airlines asserts that by itself, the delay between Chang–Craft's appeal from the Union's tentative decision to the Union's final decision withdrawing her grievance does not constitute a breach of the Union's duty of fair representation. Alaska Airlines asserts that because Chang–Craft's appeal from the Union's tentative decision failed to present new facts, the Union was not required to perform an additional investigation before issuing a final decision. Alaska Airlines further asserts that without evidence demonstrating Chang–Craft's grievance was prejudiced, the Union's failure to communicate with Chang–Craft was negligent at most and "falls far short" of breaching the duty of fair representation.

The flaw in Alaska Airlines's argument is its narrow focus only on the 15–month delay in the Union's response to Chang–Craft's appeal of the Union's tentative decision to withdraw her grievance from arbitration. We instead focus on that decision and the circumstances surrounding that decision. We agree that notwithstanding a lengthy but non-prejudicial delay, when a union offers a reasoned explanation for its decision a court usually should not question the reasoning because "[t]o do so would penalize the union for mere negligent decision making."[39] But absent some explanation of a union's decision, a court cannot "determine whether the union deliberated the issue in the first place."[40] As the Ninth Circuit has concluded, "it makes little sense to allow a union to hide behind the mantle of 'judgment' and 'discretion' when the evidence suggests that it actually exercised neither."[41] "In short, a union's unexplained failure to consider a meritorious substantive argument in favor of an

---

**31.** *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)) (alteration in original) (internal quotation marks omitted).

**32.** *Id.* at 45–46, 119 S.Ct. 292.

**33.** *Id.* at 46, 119 S.Ct. 292 (citing *Air Line Pilots*, 499 U.S. at 78–81, 111 S.Ct. 1127).

**34.** *United Steelworkers of Am., AFL–CIO–CLC v. Rawson*, 495 U.S. 362, 372–73, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990).

**35.** 115 P.3d at 562–63.

**36.** *Id.* (citing *Tenorio v. NLRB*, 680 F.2d 598, 601–02 (9th Cir.1982)).

**37.** *Id.* (quoting *Tenorio*, 680 F.2d at 601).

**38.** *Id.* (quoting *Tenorio*, 680 F.2d at 602).

**39.** *Peters v. Burlington N. R.R. Co.*, 931 F.2d 534, 540 (9th Cir.1990).

**40.** *Id.*

**41.** *Id.*

employee signals that the process has broken down...." [42] We recognize that reviewing a fair representation claim requires some evaluation of the strength of the employee's grievance, for "[i]f the employee's position is fundamentally weak, the union can hardly be faulted for failing to brood over it." [43] But if the employee's argument has merit, then it cannot be presumed that the union exercised its judgment *"when the evidence suggests otherwise."* [44]

Here, although the Union's tentative decision to withdraw the grievance noted that the Union had reviewed the facts, the CBA, and relevant arbitration awards, the Union did not explain how or why those factors supported the tentative decision to withdraw Chang–Craft's grievance from arbitration. The record gives no indication that before issuing its final decision the Union actually considered any of the evidence Chang–Craft set forth in her appeal of the Union's tentative decision. The Union's final decision to withdraw Chang–Craft's grievance failed to provide an explanation; it simply stated that the Union "has determined not to process the ... grievance further; therefore, we are withdrawing it from the System Board of Adjustment and closing our files." When viewed in the light most favorable to Chang–

Craft, this unexplained withdrawal of a meritorious grievance, especially after the 15–month delay, suggests the Union simply disregarded Chang–Craft's appeal or at best "processed [her] grievance in a perfunctory manner." [45] This can be viewed as conduct without a rational basis,[46] or egregiously unfair[47]—in other words, arbitrary conduct.

■■■ Also viewed in the light most favorable to Chang–Craft, evidence of the Union's performance during the grievance process provides additional support for the jury's finding that the Union breached its duty of fair representation. Lochner, the Union steward who filed Chang–Craft's original grievance and who attended the step-one grievance hearing, testified that in her opinion the Union did not fairly represent Chang–Craft at the step-one grievance hearing.[48] Lochner transmitted Chang–Craft's grievance file to Welch for the step-two grievance process. The jury could reasonably infer that Lochner communicated her concerns about the step-one grievance hearing to Welch and could consider that in evaluating the care Welch should have given to the step-two grievance hearing. From the testimony of Hartnett, Alaska Airlines's labor services manager, the jury could reason-

42. *Id.*

43. *Id.*

44. *Id.* (emphasis added).

45. *Vaca*, 386 U.S. at 193, 87 S.Ct. 903.

46. *See Robesky v. Qantas Empire Airways Ltd.,* 573 F.2d 1082, 1088–89 (9th Cir.1978) (holding intentional conduct without rational basis is arbitrary breach of duty of fair representation).

47. *Id.* at 1088, 1089–91 (holding unintentional conduct that is egregious, or recklessly disregards employee's rights and severely prejudices employee, is arbitrary breach of duty of fair representation).

48. Alaska Airlines asserts that admittance of and reliance on Lochner's opinion testimony about the step-one hearing violated Alaska Evidence Rule 701. Alaska Airlines implies that Lochner lacked personal knowledge about the Union advising Chang–Craft not to attend the hearing and also that Lochner's testimony "merely [told] the jury what result to reach." Rule 701 allows a lay witness to provide opinion testimony if it is "(a)

rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Here Lochner's testimony about the step-one hearing was rationally based on her personal knowledge—Lochner filed Chang–Craft's grievance, was one of three shop stewards representing Chang–Craft at the step-one hearing, and informed Chang–Craft of the recommendation that Chang–Craft not attend the hearing. Lochner also testified that she was "involved in numerous grievances" and was "trained by the union on the duties of shop stewards and the union toward their members." Lochner also stated the basis for her opinion—she thought a grievant should always be present at a step-one hearing, in part because the grievant could provide more information than what the Union had collected. Because this information could be helpful in determining whether the Union ultimately acted arbitrarily when withdrawing Chang–Craft's grievance from arbitration, admitting the testimony was not an abuse of discretion. *See Schofield v. City of St. Paul,* 238 P.3d 603, 606 (Alaska 2010) ("We review a trial court's admission or exclusion of evidence for abuse of discretion." (citing *Getchell v. Lodge,* 65 P.3d 50, 53 (Alaska 2003))).

ably determine that Welch failed to provide Hartnett with witness statements, information about previous harassment complaints against Cameron, Chang–Craft's version of the December 14 incident, or details regarding Chang–Craft's December 15 exit from work.[49] The jury could then reasonably infer that when the Union made its tentative decision to withdraw Chang–Craft's grievance from arbitration, it was aware of its representatives' handling of the step-one and step-two grievance hearings, and the jury could take that into account when evaluating the care the Union should have given to both its tentative decision and its rejection of Chang–Craft's appeal of that decision. All of this supports the conclusion that the jury could reasonably find the Union failed to take special care of Chang–Craft's grievance when it withdrew it from arbitration without explanation, and the Union handled the grievance in an arbitrary and egregious manner.

## B. Motion For Remittitur Or New Trial On Damages

### 1. Legal standards regarding damages and the motion; standard of review for the ruling

■■■■ In breach of contract actions a "plaintiff must present to the jury evidence sufficient to calculate the amount of the loss caused by the breach."[50] The evidence does not need to prove with "exact detail" the amount of damages; the evidence needs only to "be sufficient to provide a reasonable basis for the jury's determination."[51] In other words "the law does not require absolute precision, it requires only a reasonable basis for the award."[52] Although a purely speculative award of damages is impermissible:[53]

> Once actual damages are shown and there is a reasonable basis for computing an award, a defendant's opportunity for pretrial discovery of the evidentiary basis for the amount claimed, the right to cross-examine witnesses and to present evidence, as well as the judge's duty to instruct the jury on the issue of certainty provide adequate protection against speculative verdicts.[54]

■■■■ A trial court may grant remittitur "when a jury returns an otherwise proper verdict awarding an amount of damages that the evidence cannot reasonably support."[55] "Remittitur is appropriate when a jury 'without acting under the type of passion or prejudice that would warrant a new trial, nonetheless awards an amount that is unreasonable given the evidence.'"[56] We review a trial

---

49. Alaska Airlines argues that Lochner's testimony about "Welch's habits" was hearsay and that she lacked personal knowledge about how the Union handled the grievance after the step-one hearing. Alaska Airlines also argues Lochner's testimony about "Welch's grievance handling practices" was "improper character evidence under [Alaska] Evidence Rule 404." But Hartnett's testimony alone provided sufficient basis for a jury to conclude that Welch mishandled the step-two grievance process, and therefore Alaska Airlines's argument that the trial court improperly relied on inadmissible hearsay and character testimony about Welch from Lochner to deny its motions is misplaced. We further note that the trial court cloaked Lochner's testimony with a limiting instruction that it was not admitted for the truth of the matter asserted. It seems unlikely the trial court ignored its own limiting instruction when considering the evidence in the record supporting the jury's verdict, but, given Hartnett's testimony, any such error would be harmless.

50. *City of Palmer v. Anderson*, 603 P.2d 495, 500 (Alaska 1979).

51. *Id.*

52. *Id.*

53. We have recognized that:

> "[a]n award cannot stand ... if the amount is the result of speculation...." *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 222 (Alaska 1978); *Ben Lomond, Inc. v. Schwartz*, 915 P.2d 632, 636 (Alaska 1996) (citing *City of Palmer v. Anderson*, 603 P.2d 495, 500 (Alaska 1979)). *See also* 48 Am.Jur.2d, *Proof of Facts* § 18 (2001) ("Furthermore, damages for future losses must be reasonably certain of calculation and cannot be based upon speculation or conjecture.").

*Cent. Bering Sea Fishermen's Ass'n v. Anderson*, 54 P.3d 271, 279 n. 20 (Alaska 2002).

54. *City of Whittier*, 577 P.2d at 224 (footnote omitted), *disapproved on other grounds, Native Alaskan Reclamation*, 685 P.2d at 1220.

55. *Reeves v. Alyeska Pipeline Serv. Co.*, 56 P.3d 660, 668 (Alaska 2002) (citing *Exxon Corp. v. Alvey*, 690 P.2d 733, 741–42 (Alaska 1984)).

56. *N. Slope Borough v. Brower*, 215 P.3d 308, 315 (Alaska 2009) (quoting *City of Fairbanks v. Rice*, 20 P.3d 1097, 1107 (Alaska 2000)).

court's denial of remittitur for abuse of discretion, reversing "only when left with a firm conviction on the whole record that the trial judge made a mistake in refusing to order a remittitur . . . and where intervention on our part is necessary to prevent a miscarriage of justice." [57]

A trial court may grant a new trial "on all or part of the issues" tried to a jury "if required in the interest of justice." [58] When considering a motion for new trial based on a claim that the jury's verdict is against the weight of the evidence, "the court must use its discretion and independently weigh the evidence" and may set aside the verdict "even when 'there is substantial evidence to support it.' " [59] But on review:

> Because [t]he question . . . whether to grant or refuse a new trial rests in the sound discretion of the trial court . . . we view the evidence in the light most favorable to the non-moving party. We will affirm a trial court's decision to deny a new trial if there is an evidentiary basis for the jury's decision, and will only reverse a decision to deny a new trial if the evidence supporting the verdict was so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust.[60]

### 2. The trial court did not abuse its discretion by denying Alaska Airlines's motion for remittitur or a new trial on damages.

Alaska Airlines argues the evidence does not support the jury's damages award because Chang–Craft's travel benefits, which represented the majority of Chang–Craft's future damages, were improperly calculated. Alaska Airlines asserts that Briskey, Chang–Craft's damages expert, produced a fundamentally flawed damages estimate that "cannot constitute an evidentiary basis for the jury's verdict" because it failed to separate Chang–Craft's personal travel benefits from her family's travel benefits. Alaska Airlines further labels Briskey's estimate as speculative, claiming she relied solely on Chang–Craft's statements about future travel and not on "actual facts."

Prior to trial but after Briskey's initial report of lost travel benefits calculations for Chang–Craft and her family members, Alaska Airlines moved for partial summary judgment to preclude Chang–Craft from recovering lost travel benefits for non-dependent family members. Alaska Airlines acknowledged that it provided travel benefits for employees and their spouses, as well as employees' parents and dependent children. But Alaska Airlines argued that assuming damages for travel benefits were recoverable in this case, Chang–Craft had no standing to recover damages for her non-dependent family members' lost travel benefits. The court granted Alaska Airlines's motion as to Chang–Craft's children and parents, but noted that Chang–Craft could "still seek damages related to transferable travel benefits that she herself would have received."

At trial Briskey estimated Chang–Craft would have worked approximately 5 years before retiring and estimated her retirement would last approximately 27 years. Based on Chang–Craft's stated future travel plans and a summary of the number of flights Chang–Craft and her family members had previously taken, Briskey estimated that future travel would include approximately 25 round-trip flights per year. Briskey testified she calculated the travel benefits using $625 as the round-trip flight value because that represented the cost to buy enough frequent flier miles for a round-trip ticket. But she also testified that by the time of trial the cost of buying miles for a round-trip ticket had risen to $687.50.

---

**57.** *Id.* (internal quotation marks omitted).

**58.** Alaska R. Civ. P. 59(a); *Domke v. Alyeska Pipeline Serv. Co.*, 137 P.3d 295, 298 (Alaska 2006) ("A dissatisfied litigant may move for a new trial 'in the interests of justice' under Alaska Civil Rule 59(a).").

**59.** *Hogg v. Raven Contractors, Inc.*, 134 P.3d 349, 352 (Alaska 2006) (quoting *Kava v. Am. Honda Motor Co.*, 48 P.3d 1170, 1176 (Alaska 2002) (quoting 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2806 at 65 (2d ed.1995))).

**60.** *Id.* (citations and internal quotation marks omitted).

As noted earlier, Alaska Airlines asserted during its cross-examination of Briskey that her damages calculation for lost future travel benefits still included Chang–Craft's children's and parents' travel benefits, and moved to strike Briskey's testimony. Chang–Craft argued that Briskey's testimony about family travel related to transferable "buddy passes" that would have been given directly to Chang–Craft. The court concluded the dispute was a question of fact for the jury and that it would give an appropriate jury instruction.

Alaska Airlines's own expert economist, Michael Reaume, later testified about the court's pretrial order limiting travel benefits damages and his understanding that Chang–Craft's claim for travel benefits was limited to benefits for Chang–Craft, her husband, and her allowable guests, but not for Chang–Craft's children or parents. Because of the vagaries of air fares and restrictions on employee travel, Reaume was not willing to estimate the value of Chang–Craft's travel benefits. But he testified that Alaska Airlines's own estimate of the annual travel benefits was "pretty much the same" as Briskey's original estimate[61] and that the fundamental difference between "the defense and the plaintiff" was how those annual travel benefits were distributed among "Chang–Craft, her spouse, her parents, her children and guests." When Reaume actually quantified that difference based on his allocation of the travel benefits among Chang–Craft's family members, it was around $7,000.

There is no question that Chang–Craft suffered actual damages in the form of lost travel benefits. Alaska Airlines had the opportunity for pretrial discovery into those damages and to make motions to limit those damages. Alaska Airlines had the opportunity to cross-examine Chang–Craft about her stated retirement travel plans and about the extent of the travel benefits available to retired employees. Alaska Airlines had the opportunity to cross-examine Briskey about her damages calculations. Alaska Airlines had the opportunity to present its own evidence on the extent of travel benefits available to retired employees and how to value airline flights for calculating lost travel benefits. As it turned out, Reaume did not disagree with Briskey's methodology for calculating annual travel benefits, nor did he contest Briskey's updated cost estimates for travel. Reaume's sole argument for a reduction from Briskey's initial estimate was that Briskey improperly included some travel benefits for Chang–Craft's parents and children.

We agree with the trial court that Jury Instruction 27 on travel benefits made it clear that Chang–Craft could not recover for her non-dependent family members' travel benefits. We also agree with the trial court that the jury had sufficient evidence to rationally determine how many annual trips Chang–Craft and her husband would take during her retirement, how many transferable "buddy passes" Chang–Craft would receive during her retirement to use with her trips, and how to value those trips. As Alaska Airlines acknowledged: (1) approximately 70% of Chang–Craft's total damages and 95% of Chang–Craft's future damages were for lost travel benefits, and (2) the jury did not award the full damages Briskey estimated; this reflects that Alaska Airlines's cross-examinations of Chang–Craft and Briskey, along with its own expert testimony and arguments, were persuasive and that the jury followed Jury Instruction 27.

■ On this record, we are not firmly convinced that the trial court erred "in refusing to order a remittitur ... [such that] intervention on our part is necessary to prevent a miscarriage of justice." [62] Nor can we conclude that the evidence at trial, taken in

---

**61.** In her initial December 2006 report, Briskey calculated annual travel benefits of $12,739 based on (1) the Chang–Craft family's travel history and (2) the cost of purchasing 20,000 Alaska Airline miles for a round-trip ticket, which at that time was approximately $500. Reaume testified that Alaska Airlines's estimate of Chang–Craft's annual family travel benefits was approximately $12,500. As noted above, Briskey's calculations were based on an updated round-trip ticket cost of $625 and she testified that at the time of trial the cost had increased to $687.50. We note that Chang–Craft's future annual travel benefit loss was required to be reduced to present value for a jury award.

**62.** *Brower,* 215 P.3d at 315.

the light most favorable to Chang–Craft, "was so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust";[63] therefore we conclude that the trial court did not abuse its discretion by denying a new trial on damages.[64]

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the trial court's decisions.

CHRISTEN and STOWERS, Justices, not participating.

---

63. *Hogg,* 134 P.3d at 352.

64. Alaska Airlines's alternative arguments that: (1) the transferable travel passes have no pecuniary value to Chang–Craft and therefore should be excluded from the damage award, and (2) Chang–Craft should not have been allowed to recover damages for her husband's lost travel benefits, are not properly before us. First, consistent with the trial court's pretrial ruling, Jury Instruction 27 clearly detailed that Chang–Craft "may seek compensation for travel benefits that she herself would have received through employment and retirement, and could transfer to others." Alaska Airlines made no objection to this instruction nor did it argue to the trial court that the transferable travel benefits should be excluded because they lacked pecuniary value to Chang–Craft until its motion for a new trial. Second, Alaska Airlines never sought to preclude Chang–Craft from recovering damages for her husband's lost travel benefits, and Alaska Airlines's own expert estimated Chang–Craft's damages by incorporating her husband's lost travel benefits. Therefore these issues are not properly before us and we decline to address them. *See Vivian P. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 78 P.3d 703, 709 (Alaska 2003) ("We will not address an issue on appeal that was not raised at trial.") (citing *Brandon v. Corr. Corp. of Am.,* 28 P.3d 269, 280 (Alaska 2001)); *Walden v. Dept. of Transp.,* 27 P.3d 297, 304 (Alaska 2001) ("[A] party must object to evidence at the time it is offered in order to preserve the issue on appeal.").